*Decision will be entered under Rule 50.*

PENNSYLVANIA COMPANY FOR INSURANCES ON LIVES AND GRANTING OF ANNUITIES, EXECUTOR OF THE ESTATE OF A. SIDNEY LOGAN, DECEASED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 41194. Promulgated April 18, 1932.

*W. Merrick Parker, Esq.*, for the petitioner.
*L. S. Pendleton, Esq.*, for the respondent.

OPINION.

LANSDON: The respondent has proposed an additional assessment of estate tax in the amount of $17,657.56. The only issue is whether a bequest to the American Anti-Vivisection Society of Philadelphia is exempt from estate tax under the provisions of section 303 (a) (3) of the Revenue Act of 1924. The parties have entered into certain stipulations which the Board accepts and incorporates in this report by reference.

So far as pertinent to this proceeding, section 303 (a) (3), which governs the issue here, is as follows:

For the purpose of the tax the value of the net estate shall be determined—
(a) In the case of a resident, by deducting from the value of the gross estate—

\* \* \* \* \* \* \*

(3) The amount of all bequests \* \* \* to or for the use of any corporation organized and operated exclusively for \* \* \* the prevention of cruelty to \* \* \* animals \* \* \*.

The Commissioner's regulation for the administration of the above provision in Regulations 68 (1924) is as follows:

*Religious, charitable, scientific, and educational corporations.*—A corporation or association to which such a bequest was made must meet three tests: (1) It must be organized and operated for one or more of the specified purposes; (2) it must be organized and operated exclusively for such purpose or purposes; and (3) no part of its net earnings shall inure to the benefit of private stockholders or individuals.

The American Anti-Vivisection Society is a Pennsylvania corporation chartered May 1, 1883. Its purposes as set out in the original charter were to restrict the practice of vivisection within proper bounds and to prevent the injudicious and needless infliction of suffering upon animals under the pretense of scientific and medical research. On May 23, 1885, the charter was amended by changing the name of the corporation to American Society for the Restriction of Vivisection. On May 15, 1889, it was again amended to declare the purpose of the society to be "The total abolition of all vivisectional experiments on animals and other experiments of a painful nature" and the name was changed to American Anti-Vivisection Society.

The American Anti-Vivisection Society engages in various activities to effect the purposes for which it was organized. It gives rent free use of certain rooms to the Animal Rescue League and contributes to the expense of that organization, which takes off the streets of Philadelphia animals that in some cases might find their way into vivisectional laboratories. It provides for free lectures and uses billboard advertising space in its propaganda work against vivisection. It publishes a monthly magazine in which there are always some articles on the cruelty of vivisectional experiments. It has kept a man near the laboratories of the University of Pennsylvania to learn whether stolen dogs were delivered to the kennels of that institution and has sent notices to owners advising them to look not only in the city pound but in the vivisectional laboratory for missing animals.

Vivisectional experiments are conducted in various research laboratories maintained by publicly supported and/or privately endowed medical schools and endowed foundations throughout the world. The Rockefeller Institution, a research foundation engaged in investigating the causes and cures of human diseases, especially cancer, maintains its own vivisection laboratory. Similar work is done in the medical and biological departments of many of the great universities, such as Johns Hopkins of Baltimore, Pennsylvania of Philadelphia, and many others throughout the country.

Under the laws of most of our states, and of many countries, cruelty to animals is an indictable offense, subject on conviction to

heavy penalties. Societies to assist the authorities in the enforcement of such laws have been established in many jurisdictions. Such organizations have done much to relieve animals from needless suffering inflicted by careless or cruel owners and others. Recognizing the social value of such work, Congress included the exemption provision here relied on in the Revenue Act of 1924. It has been held, however, that legislation to prevent cruelty to animals is not based upon consideration for animals or recognition of man's obligation to treat them decently, but on the theory that such cruelty is " an offense against public morals which the commission of cruel and barbarous acts tends to corrupt." *Commonwealth* v. *Turner*, 145 Mass. 296; 14 N. E. 130.

The courts have had many occasions to discuss and define cruelty, but our research fails to disclose any material variation from Webster's definition, that it is " disposition to give unnecessary pain or suffering to others; in humanity, barbarity; * * * inhuman treatment; act of willfully causing unnecessary pain." In conformity with this definition the courts have very generally held that cruelty in a legal sense is willful, wanton and unnecessary infliction of pain. It is cruel to let loose a captive fox to be harried by hounds for gratification of human spectators, *Commonwealth* v. *Turner*, *supra*, or to kill or maim live pigeons that have been kept in captivity. *Waters* v. *People*, 23 Colo. 33; 46 Pac. 112; Cf. *State* v. *Porter*, 112 N. C. 887; 16 S. E. 915. On the other hand, the same courts have held that the statutes against cruelty to animals should not be construed to prevent killing game in its wild state.

The domestic use of animals requires many painful operations, none of which has ever been forbidden by legislation or denounced by the courts as cruel acts. Dehorning domestic animals inflicts great suffering; but it is not only tolerated but is very generally practiced, and in Pennsylvania it has the sanction of the legislature and the courts. (Act Pa. 1895, From 25 P. L. 286.) Breaking, branding, marking, punishing, working, docking, castrating, spaying, and caponizing are ordinary incidents in keeping animals to supply food or render service to man. Such operations must cause intense pain and suffering and certainly are not for the benefit of the animals but they have never been legally outlawed or even stigmatized as cruel, inhuman or barbarous by legislation or judicial decisions. Usage and law tolerate, permit and even encourage, and in some instances require such operations with the single limitation, not always too strictly observed, that they must be done with a minimum of suffering for the helpless creatures dedicated by age old custom to man's necessities.

Within the meaning of the law every living creature, except man, is an animal and all are either the friends or foes of human beings.

Throughout all history it has been necessary and therefore laudable to exterminate the animal enemies of humanity. Snares, traps, arrows, guns, poison, fire, parasites and countless other lethal agents and deadly devices have been used to protect man, his health and property from the menaces and depredations of noxious beasts, birds, reptiles and insects. For this purpose killers have been subsidized by the nations and the states and all the agencies of science have been enlisted. Municipalities vote bounties to encourage this warfare. Even the Congress appropriates the revenues for the extirpation of weevils, grasshoppers, fruit flies and other pests that threaten the prosperity and well-being of the people. Without question this never ending conflict between man and the so-called lower forms of life has caused dreadful pain and suffering to countless sentient beings but man's necessity knows no higher law than self preservation and must be served.

The prevention and cure of human diseases are only other phases of man's struggle to survive and are no less necessary than the conquest of visible and powerful enemies. From the dawn of history until within the very recent past mankind has been ravaged by epidemics of contagious and infectious plagues. The migrating pests of the early and middle ages, Asiatic cholera, yellow fever, syphilis and smallpox destroyed millions of lives and impoverished whole countries of happiness and prosperity before they were vanquished by dauntless men who gave their time, talent and, in many instances, their own lives to human service in the laboratories of the scientific world. Vivisection has long been considered a vitally essential investigative method in physiology, pathology, biology and curative medicine and surgery. Cerebrospinal meningitis, long regarded as practically incurable, has been conquered by an antitoxin discovered in the vivisectional laboratories of the Rockefeller Foundation that has reduced the mortality of that scourge from more than 75 to less than 25 per cent. In the experimentation which developed that antitoxin, 100 guinea pigs and 25 monkeys were sacrificed to human necessity, but for each monkey or pig so used there are today scores of sound human beings who have been restored to health and the service of their families and society by the necessary use of lower animals in the interest of mankind.

Following the discovery of America and for more than 400 years syphilis and its sequelae in many forms ravaged the nations of the western world. This scourge, so contagious and insidious that it baffled medical science and caused untold suffering and shame to innocent and guilty alike, has been conquered within our own generation by the scientist Erlich, who discovered his famous specific after seven years of vivisectional experimentation and the trial and

rejection of more than 700 alleged remedies. Space forbids more than the mention of similar results in the prevention and treatment of diphtheria, hydrophobia, tuberculosis, typhoid, and many other diseases that have yielded, or are yielding, to the attacks of science. The results already attained promise much for the future. Cancer, said to kill one person of every eight who dies after the age of forty, remains unconquered. If its germ is ever identified, and its cure determined, the vivisectional laboratories must, in all probability, render that service to humanity.

Experimentation on living animals in the interest of medical progress has been endorsed with singular unanimity by learned societies and associations devoted to the curative arts and the advancement of science. On August 12, 1913, the International Medical Congress, composed of distinguished members of the profession from every civilized country in the world, without a dissenting vote approved the following resolution:

That this Congress records its conviction that experiments on living animals have proved of the utmost service to medicine and are indispensable to the future progress. That, accordingly, while strongly deprecating the infliction of unnecessary pain, it is of the opinion, alike in the interest of man and animals, that it is not desirable to restrict competent persons in the performance of such experiments.

To the like effect are resolutions adopted by the British Medical Association in 1892; and the American Medical Association and the American Association for the Advancement of Science in 1908. These resolutions represent the collective opinion of the medical profession of all countries. On the other hand, extensive research has failed to disclose a single adverse resolution of any scientific body.

For more than two generations vivisectional experiments have had the unqualified endorsement of the most distinguished investigators. In a letter written April 14, 1881, Charles Darwin said:

On the other hand I know that physiology can make no progress if experiments on living animals are suppressed and I have an intimate conviction that to retard the progress of physiology is to commit a crime against humanity. * * * Unless one is absolutely ignorant of all that science has done for humanity, one must be convinced that physiology is destined to render incalculable benefits to man and even to animals. See the results obtained by M. Pasteur's work on the germs of contagious diseases; will not animals be the first to profit thereby? How many lives have been saved, how much suffering spared by the discovery of parasitic worms following the experiments made by Vinchow and others on living animals!

As far back as 1863, Claude Bernard, one of the greatest scientists of that day wrote:

You ask me what are the principal discoveries due to vivisection. * * * All the knowledge possessed by experimental physiology can be quoted in that

connection; there is not a single fact which is not the direct and necessary consequence of vivisection. From Galen, who, by cutting the laryngeal nerves, learnt their use for respiration and the voice to Harvey who discovered circulation; Pecquet and Aselli, the lymphatic vessels; Bell and Magendie the nervous functions, and all that has been learned since the extension of that method of vivisection, which is the only experimental method; in biology, all that is known on digestion, circulation, the liver, the lymphatic system, the bones, Development,—all absolutely is the result of vivisection, alone or combined with other means of study.

Apparently it is the contention of the petitioner here that Vinchow, Bernard, Darwin, Pasteur, and the host of less distinguished servants of humanity who have contributed so much to the wellbeing of mankind by their great discoveries, instead of praise for their beneficial achievements, merit censure for the use of living animals. We can not adopt such a view. To abolish vivisection would greatly retard the progress of preventive and curative medicine. It would stop the use of animals for the development of all the serums now used to immunize against disease or to relieve and cure after infection. The health and strength of its people are a nation's greatest asset. To adopt the views of antivivisectionists would deprive medicine of one of its most effective agencies of investigation and force a return to empirical and observational methods which, however valuable, fall far short of the demands of humanity. To grant the prayers of the petitioner here would require the Government to contribute to the cost of a movement inimical to the safety and health of the people, a result that we think was not contemplated by Congress.

In our opinion vivisection does not come within the legal meaning of cruelty to animals. It is a method of research necessary to human welfare. Such pain or suffering as may result therefrom is not willfully or wantonly inflicted. We conclude, therefore, that the American Anti-Vivisection Society is not operated exclusively to prevent cruelty to animals and so is not entitled to the benefits of section 303 (a) (3) of the Revenue Act of 1924.

Reviewed by the Board.

*Decision will be entered for the respondent.*

---

STERNHAGEN and MURDOCK, concurring: When the Board concludes, as it properly and correctly does, that vivisection is not necessarily cruelty to animals within the meaning of the statute, the ground for the decision is complete. It is, in our opinion, unnecessary and probably improper to consider the general wisdom of vivisection, and we therefore refrain from participation in the discussion of that question.

SMITH, dissenting: In my opinion the deduction of the bequest to the Anti-Vivisection Society of America is authorized by the statute. Section 303 (a) (3) of the Revenue Act of 1924 provides for the deduction from the gross estate of "the amount of all bequests * * * to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, including the encouragement of art and the prevention of cruelty to children or animals * * *." The statute is concerned only with the "purpose" for which the corporation was organized and operated. The discussion in the majority opinion as to whether the practice of vivisection is in a legal sense a cruelty to animals or beneficent to mankind goes beyond the necessities of the case. The evidence pertaining to the organization and operation of the American Anti-Vivisection Society seems to me to indicate clearly that its purposes and practices were directed generally towards prevention of cruelty to animals. I think that the bequest is deductible.